Jack **MALAMUD** et al.,
**Plaintiffs-Appellees,**

v.

**SINCLAIR OIL CORPORATION** et al.,
**Defendants-Appellants.**

No. 74–2268.

United States Court of Appeals,
Sixth Circuit.

Aug. 19, 1975.

George F. Karch, Jr., Thompson, Hine & Flory, Cleveland, Ohio, Helen H. Cutner, Philadelphia, Pa., for defendants-appellants.

Irving I. Saul, Dayton, Ohio, Earl W. Kintner, Eugene J. Meigher, Douglas G. Green,. Washington, D.C., for plaintiffs-appellees.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

The defendants, Sinclair Oil Corporation, et al., (Sinclair)[1] have filed this interlocutory appeal from the order of the district court partially denying Sinclair's motion for summary judgment. Pursuant to 28 U.S.C. § 1292(b), the district judge certified the question of plaintiffs' standing to maintain the action, and we granted permission for the appeal on September 26, 1974.

---

1. When the original complaint was filed in 1968, it named as defendants the Sinclair Refining Company and its parent corporation, the Sinclair Oil Corporation. In early 1969 both Sinclair Refining and Sinclair Oil were merged with Atlantic Richfield Company, which became the surviving company. Atlantic Richfield has since been made a party defendant. However, since all the dealings in question were with Sinclair Refining Company, the defendants shall be referred to collectively as · "Sinclair."

The plaintiffs in this case may be classified as follows: 1) the individual plaintiffs, 2) the petroleum distributing company, and 3) the three real estate investment companies. Specifically, the individual plaintiffs are Jack and Anne Malamud, the officers, directors, and sole shareholders of the four remaining corporate plaintiffs. These corporate entities are Malco Petroleum, Inc., the distributor, and Brentwood Corporation, Malco Corporation,[2] and Tobyneil Corporation, the investment firms.

In 1965 Sinclair and Malco Petroleum, Inc., executed a distribution agreement under which Sinclair agreed to supply gasoline and other petroleum products to Malco for resale by it to retail customers over a three-year period. At the same time, the parties entered into an oral understanding whereby Sinclair agreed that it would provide financial assistance to the investment companies to aid their efforts to acquire and develop new service station properties for Sinclair. Within the next few months, Jack Malamud presented for Sinclair's approval a total of five possible acquisitions proposed by the investment companies, but Sinclair declined assistance in all the ventures. After Sinclair's disapproval of the acquisitions in early 1966, Jack Malamud began negotiations with Texaco, Inc., in the hope that he would be able to replace Sinclair as the supplier. After Malamud was able to negotiate a new contract with Texaco and to place a number of stations under it, he signed a distribution agreement with that company in August of 1966. Next, on behalf of Malco Petroleum, Malamud unsuccessfully sought an early termination of the contract with Sinclair. As a result, the contract ran its course and immediately after its termination on July 31, 1968, Malco Petroleum entered into a new distribution contract, covering all of its stations, with its present supplier, Texaco, Inc.

Subsequently, the plaintiffs instituted the pending action against Sinclair, alleging violations of Section 1 of the Sherman Act[3] and Section 3 of the Clay-

---

**2.** At the time in question, Malco Corporation was a separate real estate investment firm and is not to be confused with the distributor having a similar name, Malco Petroleum, Inc. (The two companies subsequently merged.)

**3.** 15 U.S.C.

§ 1. **Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

As amended Dec. 21, 1974, Pub.L. 93–528, § 3, 88 Stat. 1708.

ton Act[4] because of Sinclair's refusal to permit an early termination of the distribution contract and because of its failure to provide financing for expansion.[5] The district court described the plaintiffs' antitrust claims as follows:

> The Malamuds and their corporations each claim substantial damage in that each has lost:
>
> 1. Profits from unrealized sales growth; and
>
> 2. The unrealized increase in going business value. All plaintiffs except Malco also claim damage from unrealized growth in real estate equity ownership.
>
> Plaintiffs' theory of causation of damage is that because Sinclair refused to provide financial assistance to the investment companies for their efforts to expand, and because Sinclair would not terminate its contract with Malco, thereby freeing Malco to negotiate with other suppliers for the required financing agreement, the investment companies would have acquired more stations. Malco's claims to lost profits stem from unrealized sales to these prospective service stations. The Malamuds claim that their interests in these companies would have been enhanced but for Sinclair's adherence to its contractual rights.

Sinclair claimed in a motion for reconsideration of the district court's denial of its original motion for summary judgment that all of the plaintiffs lacked standing to sue because none of them had been directly injured by any alleged antitrust violation. In considering this challenge, the district court held that all the plaintiffs had standing, as defined in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in that they had alleged "injury in fact" and that "the interest sought to be protected . . . [was] arguably within the zone of interests to be protected . . . ." *Id.* at 152–53, 90 S.Ct. at 830. But as the lower court pointed out, relying on our decision in *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962), "in a private anti-trust action, a plaintiff must prove an injury . . . to his business or property which bears a direct and causal relationship to the proven anti-trust violations." Turning to this issue, the court found from the pleadings as a matter of law that neither the individual plaintiffs nor the distributorship could possibly establish a sufficiently direct injury to make out an antitrust claim.[6] With regard to the investment companies, the court reasoned that there were mixed questions of law and fact relevant to the issue of directness of their alleged injury. "A prerequisite to a grant of summary judgment is that there be no genuine issue as to material fact and that the moving party be entitled to a judgment

---

4. 15 U.S.C.

> **§ 14. Sale, etc., on agreement not to use goods of competitor**
>
> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other

521 F.2d—72½

commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Oct. 15, 1914, c. 323, § 3, 38 Stat. 731.

5. In a separate count, the plaintiffs alleged essentially the same facts to make out a common law claim of misrepresentation. No aspect of that claim is before the Court on this appeal.

6. The propriety of the district court's dismissal of the claims of the individual plaintiffs and of the distributorship is not before the Court on this appeal.

as a matter of law." *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193, 1195 (6th Cir. 1974). As this test was not satisfied, the district court correctly decided that summary judgment was inappropriate as to the investment companies.[7] The court subsequently certified for appeal the threshold question of the standing of these investment firms to sue.

The question of a party's standing to sue under Section 4 of the Clayton Act[8] has been and continues to be troublesome to the courts. The origin of the difficulty can be traced to the broad wording of the statute itself which provides in pertinent part that "[a ]*ny person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue. . . . " [emphasis added]. Despite this sweeping pronouncement, the courts have restricted the scope of the statute. "The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." [citation omitted] *Hawaii v. Standard Oil Co.,* 405 U.S. 251,

n.14 at 263, 92 S.Ct. 885, at 891, 31 L.Ed.2d 184 (1972). One method used to limit the applicability of Section 4 has been to employ the standing doctrine as a screening device to deny plaintiffs access to the courts.

As a general proposition, the doctrine of standing is one aspect of the broader concept of justiciability. *See Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 150, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Justiciability is an analytical approach that has been "developed to identify appropriate occasions for judicial action, both as a matter of defining the limits of the judicial power created by Article III of the Constitution, and as a matter of justifying refusals to exercise the power even in cases within the reach of Article III." [footnote omitted] 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3529, at 146 (1975) [hereinafter cited as 13 Wright]; *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Article III, Section 2 of the Constitution establishes the boundaries for the limited jurisdiction of the federal courts.[9] How-

---

**7.** In its opinion the district court set out those issues of fact that remain unresolved and that made a grant of summary judgment inappropriate as to the investment firms:

> The question of whether Sinclair's refusal to finance was a means to accomplish the anti-trust violation is intricately related to the question of whether the Sinclair contract with Malco was a requirements contract; if Sinclair's refusal was a material factor resulting in that contract having the effect of a requirements contract, and that contract was illegal, then said refusal was a means to effectuate an illegal restraint. These questions present material mixed questions of fact and law as to the effect of said refusal which are not presently resolved. Therefore, the requirement of direct injury to the investment companies being unresolved, summary judgment is inappropriate.

> As noted previously, however, this conclusion is predicated upon the assumption that the investment companies' injury was in fact caused by Sinclair's refusal to finance. Sinclair challenges this assumption, claiming that any injury resulted solely from the investment companies' failure to obtain alternative financing. Yet this argument assumes that alterna-

tive financing was reasonably then available; this fact has not been demonstrated. Even if alternative financing arrangements were available, any additional costs incurred therein would have been caused by Sinclair's refusal. The Court concludes that questions of fact remain as to whether Sinclair's refusal caused the investment companies' injury.

**8.** 15 U.S.C.

> **§ 15. Suits by persons injured; amount of recovery**
> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Oct. 15, 1914, c. 323, § 4, 38 Stat. 731.

**9.** Article III.

> Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be

ever, within these constitutional strictures, "[t]he Congress has considerable discretion in dealing with the jurisdiction of the lower federal courts." 13 Wright § 3526, at 108. Although the judicial power of the government is provided for in the Constitution, it remains for the Congress to allocate this power; to grant to or withhold from the federal courts jurisdiction in specific types of cases. *See Palmore v. United States,* 411 U.S. 389, 401, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *see also Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845). Justiciability, then, is a jurisdictional concept founded in part upon Article III and in part upon judicial discretion. *See Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Standing is just one of several more specific categories derived from the general considerations of justiciability.[10]

"The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Since standing refers to identifying the proper litigant in a suit, it is related but not identical to the concept of the real party in interest. The former doctrine usually applies to "public" suits and the latter to "private" ones. Hence, standing pertains to suits brought by individuals or groups challenging governmental action which has allegedly prejudiced their interests. On the other hand, the real party in interest question is raised in those much rarer instances between private parties where a plaintiff's interest is not easily discernible. *See* 13 Wright § 3531, at 176; Hasl, *Standing Revisited—The Aftermath of Data Processing,* 18 St.L.U.L.J. 12 (1973). On account of this difference, the recent developments in the area of standing have taken place in the field of administrative law. *See, e. g., United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Meanwhile, in the area of antitrust law, a plaintiff's standing to sue has been frequently raised in the lower courts. Yet, it has not received a definitive treatment by the Supreme Court.

The basis for a standing challenge in antitrust law is Section 4 of the Clayton Act which attempts to define those persons who may maintain an action under any of the substantive antitrust provisions. According to the statute, *any person* can file suit provided he was "injured in his business or property by reason of" the unlawful activities of the defendant. Additionally, the statute permits the plaintiff to recover treble damages as well as attorneys' fees. This

made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**10.** The specific categories subsumed under the concept of justiciability are listed as: "advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions and administrative questions." 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3529, at 146 (1975); *see also Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

broad remedial statute which is available to private persons is an integral part of the enforcement scheme of the federal antitrust laws. Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,* 64 Colum.L.Rev. 570, 571 (1964). By providing sufficient incentive to private plaintiffs to file suit for alleged violations of the antitrust laws, Section 4 serves as an additional deterrent supplementing the government's enforcement of these same statutes. *Id.* at 571; *cf. United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). In furtherance of this congressional policy permitting private enforcement, the Supreme Court has disapproved of burdening the private litigant with judicially imposed requirements beyond those specifically provided by Congress. *Radovich v. National Football League,* 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

By means of Section 4, Congress sought to distinguish between those persons who would be permitted to bring a private action and those who would not be. Although the statute is broadly worded and reflects a similarly expansive congressional enforcement policy, by its very terms it does not grant access to the courts to persons interested merely as members of the public in enforcing the various antitrust laws. The statute defines the real party in interest as being any person *who has been injured.* This definition would seem also to comport with the minimum requirements of Article III of the Constitution, i. e., injury in fact. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 151–52, 90 S.Ct. 827 (1970); 13 Wright § 3531, at 176.

Some courts, however, have seized upon the statute's causation language ("by reason of") and incorporated it into their notions of standing, thus creating a second obstacle for any prospective plaintiff. By including this causation element as part of a determination of standing, the courts have been able both to restrict the applicability of Section 4 and to do so at an early stage in the lawsuit.

The development of a standing doctrine peculiar to antitrust actions has been in response to a conflict "between the policy of enforcement and the need to eliminate spurious claims brought for the purpose of coercing settlement or lured by the possibility of a treble damage windfall." Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,* 64 Colum.L.Rev. at 585 (1964). As pointed out by one commentator, "[a] prime cause of increased litigation of standing issues in antitrust matters is the multi-level distribution system which predominates with respect to almost all products sold in the United States." Beane, *Antitrust: Standing & Passing On,* 26 Baylor L.Rev. 331, 332 (1974). Not only is the issue of a plaintiff's standing to sue more frequently litigated but also the doctrine itself is used more often to dispose of cases at a preliminary stage.

The federal courts, as noted in *Hawaii v. Standard Oil Co., supra,* are in agreement that not every person injured is entitled to the recovery of threefold damages. Specifically, the courts have required private parties to show directness of injury, and this requirement has been incorporated into the standing doctrines which have been used to limit a litigant's access to the courts under Section 4. The courts, however, disagree as to what constitutes a sufficiently direct causal connection between the alleged injury of a plaintiff and the purportedly unlawful activities of the defendant. As a result, the circuits have devised two distinct standing doctrines that reflect these different concepts of causal directness. These competing theories of standing have been classified generally as the "direct injury" approach and the "target area" approach.[11] *In Re Multidistrict Vehicle Air Pollution M.D.L. No.*

---

11. In the present case we are not concerned with the correctness of the two approaches insofar as they pertain to fixing liability under Section 4. However, we are interested in these two theories as they relate to the question of standing.

*31,* 481 F.2d 122, 125–30 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

The case of *Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir. 1910), decided under Section 4's predecessor in the Sherman Act, is considered to be the genesis of the "direct injury" approach. In that decision the Third Circuit denied standing to a stockholder of a competitor that allegedly had been forced out of business by certain activities of the defendant, Eastman Kodak. The court reasoned that the stockholder could not maintain an individual action because the alleged injury had occurred to the corporation. According to the court, any damage suffered by the plaintiff was "indirect, remote, and consequential." 183 F. at 709. This decision, then, introduced the notion of privity to the analysis of a person's standing to sue under the antitrust laws. *See In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d at 127. Succinctly stated, the "direct injury" theory is based upon "an analysis of the relationship between the claimant and the alleged antitrust violator; if the victim and the perpetrator are separated by an intermediary party, standing is usually denied to the claimant." Beane, *Antitrust: Standing & Passing On,* 26 Baylor L.Rev. at 233.

"In contrast, courts employing the 'target area' approach focus on claimant's relationship to the area of the economy allegedly injured by the defendant." *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d at 127–28. The classic formulation of the test was made in *Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), in which the court stated:

[T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade

and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws.

*See also Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955).[12]

Having examined the two competing approaches, we are of the opinion that as standing doctrines both theories really demand too much from plaintiffs at the pleading stage of a case. The difficulty stems from confusion between the determination of a litigant's standing and a decision on the merits of his position. As discussed earlier, the doctrine of standing poses the question whether a particular person is a proper party to litigate a given issue. Undoubtedly, the principal function of the doctrine is as a device to eliminate those plaintiffs who are jurisdictionally barred by Article III from maintaining a suit. Clearly provided for under Section 4 is the requirement that any person must have suffered injury at the hands of the defendant before he can bring an action. This prerequisite both defines the real party in interest and satisfies the minimum criterion established by Article III. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. at 151–52, 90 S.Ct. 827. The remaining prong of the standing concept pertains to those cases in which a party complies with Article III but yet is denied the right to pursue the case because of a policy of judicial self-restraint. *See Barrows v. Jackson,* 346 U.S. at 255, 73 S.Ct. 1031; 13 Wright § 3531, at 176. It is this last portion of the doctrine that has caused the current confusion between a decision on the merits and one on standing.

The courts have used one or the other of the two approaches as standing doc-

**12.** For a thorough compilation of those cases referring to either "direct injury" or "target area" *see In Re Multidistrict Vehicle Air Pollu-* *tion M.D.L. No. 31,* 481 F.2d 122 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

trines in order to arrest some antitrust litigation at an early stage. As we see it, however, by using either approach a court is enabled to make a determination on the *merits* of a *claim* under the guise of assessing the *standing* of the *claimant.* Under either theory the entire question of directness is one that must be resolved upon some factual showing,[13] but standing is a preliminary determination ordinarily to be evaluated upon the allegations of the complaint. As a result, a party may make sufficient allegations to demonstrate the necessary standing to sue but fail to prove his case on the merits. *Warth v. Seldin,* 422 U.S. at 500–502, 95 S.Ct. at 2206. While we are in sympathy with the policy of limiting the breadth of Section 4, by whatever theory, we are equally mindful of the Supreme Court's admonition that summary judgment "should be used sparingly in complex antitrust litigation where motive and intent play leading roles . . . ." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Although "[t]rial by affidavit is no substitute for trial by jury,"[14] it is to be preferred to no trial at all which is the result of dismissal of an action on standing grounds because the alleged injury is not sufficiently direct.

Courts and commentators alike are wont to cite the decision of *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963), for the proposition that this Circuit adheres to the "direct injury" test for standing.[15] In that case the plaintiffs, Volasco Products Company and Volunteer Asphalt Company, brought suit against the defendant pursuant to Section 4 of the Clayton Act. Volasco was a local company engaged in the manufacture of asphalt roofing products and Volunteer was its supplier of raw materials. The two companies were separate legal entities but were owned by the same shareholders and operated by the same officers. Volasco contended that the Lloyd A. Fry Roofing Company, the largest producer of asphalt roofing material in the country, had cut its prices drastically in those geographic areas in which it competed against Volasco. Volunteer's claim was that the resulting decline in Volasco's sales of the finished product resulted in a concomitant drop in its own sales of raw material to the manufacturer. This Court concluded that the supplier was too remote from the violation, which was directed at the manufacturer, to maintain the action under the law.

Contrary views notwithstanding, the *Volasco* decision is not a delineation of this Court's view of the doctrine of standing in antitrust suits. Simply put, the Court in that case was not concerned with Volunteer's standing but with its showing of directness on the merits. It is patently clear from the opinion that Volunteer had appealed from the dismissal of its claim following a directed verdict at the conclusion of plaintiff's proof and not from dismissal because

---

**13.** This showing normally would entail an adversary hearing although directness could be evaluated upon a motion for summary judgment where no material dispute of facts was at issue. *But see Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

**14.** *Poller v. Columbia Broadcasting System,* 368 U.S. at 473, 82 S.Ct. at 491.

**15.** A partial listing of these authorities is as follows: *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir. 1973); *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Nationwide Auto Appraiser Service, Inc. v. Asso-*

*ciation of Casualty and Surety Companies,* 382 F.2d 925 (10th Cir. 1967); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679 (8th Cir. 1966); *Midway Enterprises, Inc. v. Petroleum Marketing Corp.,* 375 F.Supp. 1339 (D.Md.1974); *H. F. & S. Co. v. American Standard, Inc.,* 336 F.Supp. 110 (D.Kan.1972); *Minersville Coal Co. v. Anthracite Export Association,* 335 F.Supp. 360 (M.D.Pa.1971); *N. W. Controls, Inc. v. Outboard Marine Corp.,* 333 F.Supp. 493 (D.Del.1971); *Minnesota v. United States Steel Corp.,* 299 F.Supp. 596 (D.Minn.1969), *vacated on other grounds,* 438 F.2d 1380 (8th Cir. 1971); Beane, *Antitrust: Standing and Passing On,* 26 Baylor L.Rev. 331 (1974); Comment, 77 Dick.L.Rev. 73 (1972).

plaintiff was an improper litigant, *i. e.*, a litigant without standing, 308 F.2d at 393. As pointed out above, a court's theory on the merits of an antitrust claim is not relevant in assessing one's standing to assert the claim. Thus, regardless of the treatment in *Volasco* of Volunteer's *substantive* claim, the opinion does not have the effect of placing this Circuit among those that adhere to the "direct injury" approach to standing.

■ We believe that the test to be applied in an antitrust action is the one expressed by the Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp, supra.* Admittedly, the test was developed for use in the area of administrative law in suits challenging governmental actions, and its uncritical application to cases involving nongovernmental action has been questioned. *See American Postal Workers Union, Detroit Local v. Independent Postal System of America, Inc.*, 481 F.2d 90 (6th Cir.), *cert. granted*, 414 U.S. 1110, 94 S.Ct. 839, 38 L.Ed.2d 737 (1973), *cert. dismissed*, 415 U.S. 901, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974); *Solien v. Miscellaneous Drivers and Helpers Union, Local No. 610*, 440 F.2d 124 (8th Cir.), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 680 (1971); Hasl, *Standing Revisited—The Aftermath of Data Processing*, 18 St.L.U.L.J. 12 (1973). Nevertheless, a private antitrust action is not the typically private suit which raises no standing issues because the real party in interest is obvious. 13 Wright § 3531, at 176. Because a private action under Section 4 has some considerable enforcement value, it is in the nature of a public suit. As with a suit in the administrative law field, a private antitrust claim seeks both to remedy the alleged injury to the private plaintiff and to "vindicate the important public interest in free competition." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969); *see Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d at 365.

■ The first prong of the *Data Processing* test is that the plaintiff allege that the defendant caused him injury in fact. In the present case the investment companies assert that the failure of Sinclair to provide the needed financing effectively foreclosed their ability to expand their operations. Clearly such a claim of injury as the result of the defendant's acts satisfies the first element of the test.

■■ The second criterion, according to *Data Processing*, is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. At the outset, it should be noted that the section establishing the right of review under the Administrative Procedure Act (APA) [16] is a broad standing statute analogous to Section 4 of the Clayton Act. Both sections accord standing in light of other statutory provisions. In *Data Processing* the relevant statute was Section 4 of the Bank Service Corporation Act of 1962 [17] within which the plaintiff's interest arguably fell. In the present case, the pertinent substantive statutes under which the plaintiffs alleged a violation were § 1 of the Sherman Act [18] and § 3 of the Clayton Act. [19] For the investment firms to satisfy this second prong, their interests must fall within either or both of these statutes. The plaintiffs contend that Sinclair sought to maintain the status quo for the marketing of petroleum products in that area served by the distributorship. As a means to that end, it is charged that Sinclair refused to assist the investment companies in their expansion efforts. The interest sought to be protected by the real estate firms is the expansion of their business by the

---

**16.** 5 U.S.C. § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392.

**17.** 12 U.S.C. § 1864.

**18.** *See* n. 3, *supra.*

**19.** *See* n. 4, *supra.*

acquisition and development of additional service station sites. The parties entered into a financing agreement to achieve that purpose, but no acquisition proposal was ever agreed to. The antitrust laws were enacted to preserve competition and thereby to protect the individual plaintiff and the consuming public from the effects of any combinations or conspiracies in restraint of trade. *D. R. Wilder Manufacturing Co. v. Corn Products Refining Co.*, 263 U.S. 165, 173–74, 35 S.Ct. 398, 59 L.Ed. 520 (1915); *Crawford Transport Co. v. Chrysler Corp.*, 338 F.2d 934, 939 (6th Cir. 1964), *cert. denied,* 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965). Under the circumstances as alleged in the plaintiffs' complaint, this denial of financing arguably comes within the zone of interests protected by the Sherman and Clayton Acts. Regardless of what the proof at trial may show, the investment companies have made sufficient allegations to establish their standing to sue under the antitrust laws. Thus the district court correctly concluded that this particular group of plaintiffs had standing.

Affirmed and remanded.