**SOUTHAVEN LAND CO., INC.,**
**Plaintiff-Appellant,**

v.

**MALONE & HYDE, INC.,**
**Defendant-Appellee.**

**No. 81–5736.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1982.

Decided Aug. 23, 1983.

Robert M. Fargarson, Bruce Brooke (argued), Neely, Green & Fargarson, Memphis, Tenn., for plaintiff-appellant.

Jef Feibelman, Memphis, Tenn., for defendant-appellee.

Before LIVELY and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

This action joins inquiry into the evolving doctrine of antitrust "standing" under Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff Southaven Land Company, Inc. (Southaven) initiated the instant cause of action against Malone & Hyde, Inc. (Malone) seeking injunctive and monetary relief for injuries allegedly resulting from Malone's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Southaven appealed from the judgment of the United States District Court for the Western District of Tennessee granting Malone's motion to dismiss, Rule 12(b), Fed.R.Civ.P., adjudging that Southaven lacked "standing" to initiate an antitrust action.

The allegations of the complaint must be accepted as true for purposes of Rule 12(b)(6) analysis. Briefly summarized the complaint asserts Southaven is an owner-lessor of retail commercial space in the geographic area of Southaven, Mississippi. Malone is engaged in the wholesale and retail sale of food, drugs and sundries in a multistate area including the geographical area of Southaven, Mississippi. On or about May 15, 1974, Malone assumed a lease to premises owned by Southaven, which incorporated a covenant restricting the use of the premises to the operation of a retail grocery business. Subsequent to its assumption of the lease, Malone executed a series of subleases with successive third parties to operate grocery stores at the Southaven location in accordance with the above defined restrictive covenant. The last of these successive subtenants, Southaven Food Center, Inc. (SFC), filed a petition in bankruptcy. Malone has not subleased the premises since SFC's business demise.

During 1974, and thereafter, Malone also owned and operated other retail grocery outlets in the Southaven geographical area and, it is alleged, intentionally sought to destroy competition, monopolize and control the food supply in that area, and had undertaken to cut prices and otherwise destroy and foreclose the operation of a successful grocery store at Southaven's commercial property.

Subsequent to the bankruptcy of SFC, Malone's last subtenant, Southaven initiated negotiations with Malone seeking a cancellation of Malone's lease to enable Southaven to replace Malone with a viable grocery operator in the premises. Pursuant to the negotiations whereby Southaven sought to regain control of the property, an agreement [1] was derived providing for the cancellation of the Malone lease and delivery of the premises and equipment to Southaven whereupon Malone would be released from

1. It appears that this agreement was never reduced to writing. *See:* Complaint, Exhibit B (Mutual Cancellation Agreement executed only by Southaven.)

its obligations at the site. In reliance upon said agreement, Southaven secured a viable tenant to operate a grocery store at the shopping center site.

Upon learning that Southaven was prepared to immediately implement the operation of a grocery store at its commercial location, Malone refused to execute the mutual cancellation agreement with the calculated purpose to further its monopoly and eliminate competition. Malone, with intent to destroy the site as a present and future location for the operation of a retail grocery outlet, removed its equipment from the premises thereby rendering them unfit as a retail grocery outlet.

Accordingly, Southaven's injury is charged to have accrued as a result of its contract negotiations with the alleged antitrust violator. The complaint noticeably fails to aver that Southaven sustained any injury as a competitor, purchaser, consumer or other economic actor in the grocery industry. The district court, styling the issue as "whether a 'non-operating' lessor of premises has standing to complain about conduct purportedly aimed at monopolizing a market in which the lessor's tenants compete", adjudged that Southaven lacked "standing" under § 4 of the Clayton Act. This appeal ensued.

Section 4 of the Clayton Act, 15 U.S.C. § 15, identifies in sweeping language those "persons" entitled to initiate an antitrust action:

> *Any* person who shall be injured in his business or property by reason of *anything* forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained ... (emphasis added)

Although "[o]n its face, § 4 contains little in the way of restrictive language", *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982), *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), and, consistent with congressional intent, the federal forum must guard

against "engraft[ing] artificial limitations on the § 4 remedy", *McCready, supra,* 102 S.Ct. at 2545, application of § 4 has of necessity been judicially confined to limit the remedy available thereunder to particular classes of persons and for redress of particular forms of injury. *See also: Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

Judicial limitation of the § 4 remedy to those persons and injuries within the core of congressional concern, while simultaneously guarding against the imposition of "artificial limitations" of the facially unrestrictive § 4 remedy, has proven to be less than an empirical judicial science. In an attempt to relieve this dichotomy, the circuit courts have embraced various analytical doctrines including the "direct injury" test and "target area" test. Under the target area test the injured party "must be the 'target' of the anti-competitive practice before he may sue." *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 546 (5th Cir.1980). The oft-cited decision of *Calderone Enterprises Corp. v. United Artists Theatre Circuit,* 454 F.2d 1292 (2d Cir.1971) provides the following rule:

> [T]his court has committed itself to the principles that in order to have "standing" to sue for treble damages under § 4 of the Clayton Act, a person must be within the "target area" of the alleged antitrust conspiracy, i.e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly, we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with "targets" or with participants in an alleged antitrust conspiracy, rather than being "targets" themselves.

*Id.* at 1295 (emphasis added).[2] *Calderone,* therefore, excludes as targets those "who have suffered economic damage by virtue of their relationships with 'targets'". *Id.* at 1295.

---

**2.** *Calderone* defined a "target" as

a person or business against which competitive aim is taken. The line is clearly drawn

by requiring that to have standing one must be an object of an antitrust conspiracy. *Id.* at 1296, note 2.

The Fifth Circuit, referencing a "target area" test, has also framed the pertinent inquiry in terms of sector of the economy:

> The "target area" test arose as a means of limiting the class of potential treble-damage plaintiffs to those persons who could most adequately vindicate the purposes of the anti-trust laws. To attain standing a person (whether a corporation or individual) must be one against whom the conspiracy is aimed. Or, put in plutonomic terms, the complainant must show that he is *within that sector of the economy which is endangered by a breakdown of competitive conditions* in a particular industry. (emphasis added)

*Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir.1975). *Accord: In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973), *cert. denied sub nom. Morgan v. Automobile Manufacturing Association,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973) (compilation of cases referring to "direct injury" and "target area" tests). *See also: In re Industrial Gas Antitrust Litigation,* 681 F.2d 514 (7th Cir.1982); *Reading Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d 10, 12 (2d Cir.1980); *Long Island Lighting Co. v. Standard Oil Co. of Calif.,* 521 F.2d 1269, 1274 (2d Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436 (5th Cir.1982); *Engine Specialties Inc. v. Bombardier, Ltd.,* 605 F.2d 1, 18–19 (1st Cir.1979); *Schwimmer v. Sony Corp. of America,* 637 F.2d 41, 46 (2d Cir.1980); *Ostrofe v. H.S. Crocker Co., Inc.,* 670 F.2d 1378 (9th Cir.1982).

■ Under the "direct injury" test the injury of the § 4 plaintiff must not be too remote from the alleged antitrust violation:

> The concept of "direct injury," derived from *Loeb v. Eastman Kodak,* 183 F. 704

(3rd Cir.1910), focuses on the relationship between the plaintiff and the defendant. If the alleged injury is "remote," such as that of a stockholder or creditor of a corporation injured by the defendant, standing is denied. *Loeb, supra; Gerli v. Silk Association of America,* 36 F.2d 959, 960 (S.D.N.Y.1919).

*Chrysler Corporation v. Fedders Corporation,* 643 F.2d 1229, 1233 (6th Cir.1981). The direct injury test, accordingly, injects into the § 4 inquiry concepts of "relationship" very analogous to those of foreseeability developed in doctrines of common law negligence.

This Circuit has on two occasions expressly rejected the "direct injury" and "target area" tests as limiting the § 4 remedy. *See: Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142 (6th Cir.1975); *Chrysler Corp. supra.* In *Malamud* it was concluded that both tests "demand[ed] too much from plaintiffs at the pleading stage of a case", 521 F.2d at 1149, and further "enabled [the court] to make a determination on the *merits* of a *claim* under the guise of assessing the *standing* of the *claimant.*" *Id.* at 1150 (original emphasis). The less restrictive test of "standing" as pronounced in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) was adopted in *Malamud.* Thereunder, the § 4 "person" pleading (1) injury in fact and (2) an interest arguably within the zone of interests to be protected or regulated by the statute in question possessed "standing" to initiate an antitrust action. Since the *Data Processing* zone of interests test was derivative of Article III of the United States Constitution, *Malamud* effectively engrafted a constitutional definition of standing into antitrust law.[3]

---

3. The Supreme Court prefaced its discussion in *Data Processing* with the following observation:

> Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to "cases" and "controversies". As we recently

stated in *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 "[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."

397 U.S. at 151–52, 90 S.Ct. at 829. *Malamud* reflected:

Subsequent to *Malamud* the Supreme Court issued *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), establishing therein the requirement of "antitrust injury" as a prerequisite to § 4 "standing":

Plaintiffs must prove an *antitrust* injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of the anti-competitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. at [100] 125, 89 S.Ct. [1562] at 1577 [23 L.Ed.2d 129].

429 U.S. at 489, 97 S.Ct. at 697–98 (original emphasis; footnote omitted). In *Chrysler Corp., supra,* this Circuit adjudged that *Brunswick* did not vitiate the *Malamud* test of § 4 "standing" but, rather, *added* an "antitrust injury" requirement:

In order to establish standing in an antitrust action, this circuit continues to require (1) that the plaintiff allege injury in fact and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the statute in question. *Brunswick* adds to that standard the requirement that the plaintiff allege *antitrust* injury when seeking treble damages under § 4 of the Clayton Act. Unlike the "direct injury" and "target area" tests, *Brunswick* does not inject an element of proximate cause into the standing inquiry; rather, it compels the court to focus on the *type* of injury pleaded and its relationship to the alleged anti-competitive conduct.

*Chrysler Corp., supra,* 643 F.2d at 1235. The "target area" test was again expressly rejected as overburdening the plaintiff at the pleading stage and impermissibly authorizing a court to issue a determination on the merits of a claim under the guise of assessing standing, *Chrysler Corp., supra,*

643 F.2d at 1233, and, additionally, "inject[ing] an element of proximate cause into the standing inquiry." *Id.* at 1235.

Re-examination of this Circuit's § 4 "standing" doctrine as enunciated in *Malamud* and *Chrysler Corp.* is mandated by the Supreme Court's recent decisions in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) and *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In *McCready* plaintiff Carol McCready (McCready) subscribed to a group health plan which had been purchased by her employer, Prince William County, Virginia, from defendant Blue Shield of Virginia (Blue Shield). The Blue Shield health plan authorized reimbursement to subscribers for psychotherapy services provided by psychiatrists but did not provide similar reimbursement for services rendered by psychologists unless the treatment was supervised by and billed through a physician. McCready engaged the services of a psychologist and was subsequently denied reimbursement by Blue Shield in accordance with the plan's provisions. McCready thereupon initiated a class action alleging that Blue Shield and the Neuropsychiatric Society of Virginia, Inc. had conspired in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to exclude and boycott clinical psychologists from receiving compensation under Blue Shield group health plans. The Fourth Circuit, applying the target area doctrine, adjudged that McCready's loss was not "too remote" or indirect to be covered by the Act. 649 F.2d 228 (4th Cir.1981). Affirming, the Supreme Court majority in *McCready* concluded that deference to statutory policy had prompted acknowledgement of two categories of judicial confinement of the § 4 remedy: (1) cases presenting a risk of duplicative recovery and (2) cases wherein the persons "sustained injuries *too* remote [from an antitrust violation] to give them standing to sue

[T]he doctrine of standing poses the question whether a particular person is a proper party to litigate a given issue. Undoubtedly, the principal function of the doctrine is as a device to eliminate those plaintiffs who are jurisdictionally barred by Article III from maintaining a suit.
521 F.2d at 1149.

for damages under § 4". 102 S.Ct. at 2547, citing *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 728 n. 7, 97 S.Ct. 2061, 2065 n. 7, 52 L.Ed.2d 707 (1977). Two areas of sub-analysis were employed by the Court to identify those injuries characterized as "too remote":

> [W]e look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

102 S.Ct. at 2548.

Applying the first area of sub-analysis for identifying an injury as "too remote", to-wit, the physical and economic nexus between the alleged violation and the harm to the plaintiff, the Court concluded that McCready's injury was not too remote since, as a recipient of psychotherapy services, she was " 'within that area of the economy . . . endangered by [that] breakdown of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." 102 S.Ct. at 2549, citing *Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973).[4] Applying the second area of sub-analysis for identifying an injury as "too remote", namely, the relationship of the injury alleged with those forms of injury which Congress was likely to have been concerned, the Court adjudged that her injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market", 102 S.Ct. at 2551, and therefor "squarely within the area of congressional concern." *Id.* Accordingly, *McCready* injects into the § 4 inquiry elements of proximity and directness which

were deemed impermissible by this Court in *Chrysler Corporation.*[5] The "constitutional" concept of standing, as espoused in *Data Processing* and adopted in *Malamud,* was not acknowledged in *McCready* as pertinent to the § 4 inquiry.

In its most recent antitrust "standing" decision, *Associated General Contractors, supra,* the Supreme Court removed all doubt as to the relevant inquiries to be implemented by federal courts confronting the perimeters of § 4. Examination of the legislative history of § 4 prompted the Supreme Court to conclude that "Congress simply assumed that the antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation". —— U.S. at ——, 103 S.Ct. at 906. The judicially created doctrines which circumscribed the availability of damages at the time of promulgation of § 4 included concepts of foreseeability, proximate cause, directness of injury, certainty of damages and privity of contract. —— U.S. at ——, 103 S.Ct. at 905–06. The issue of whether a § 4 plaintiff "may recover for the injury it allegedly suffered" requires the federal court, as mandated in common-law damages litigation evolving from the 1890s, to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." —— U.S. at ——, 103 S.Ct. at 907. The § 4 inquiry is distinct from the constitutional "standing" inquiry:

> The label "antitrust standing" has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the consti-

---

**4.** The language of *Multidistrict Vehicle Air Pollution,* cited with approval by the Supreme Court, was twice rejected by this Circuit. *See Chrysler Corp., supra,* 643 F.2d at 1233; *Malamud, supra,* 521 F.2d at 1149.

**5.** The inquiry of whether an injury is "too remote" from an antitrust violation was analogized to an inquiry of proximate cause:

> In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of "proximate cause".

*McCready, supra,* 457 U.S. at 477, 102 S.Ct. at 2548.

tutional standing requirement of injury in fact, but the court must make a *further* determination whether the plaintiff is a proper party to bring a private antitrust action.

—— U.S. at ——, note 31, S.Ct. at 907, note 31 (emphasis added). Significantly, in an obvious attempt to implement uniformity among the circuits in the area of antitrust "standing", and discourage use of analytical "tests" which may impermissibly restrict the § 4 inquiry,[6] the Supreme Court forewarned that labels such as directness of the injury, target area and zone of interests "may lead to contradictory and inconsistent results", and proclaimed that "[i]n our view, courts should analyze each situation in light of the factors set forth in the text *infra*."

—— U.S. at ——, 103 S.Ct. at 908, note 33.[7] The "factors" expressly identified as such in the text include, *inter alia*, (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury in-

cluding the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. 103 S.Ct. at 908–13.

*McCready* and *Associated General Contractors* exemplify that innumerable elements, including proximity and directness, constitute proper areas of inquiry in identifying a "person" injured by reason of a violation of the antitrust laws within the meaning of § 4. Examination of these factors facilitates identification of "who is entitled to prosecute an action under § 4".[8] *Associated General Contractors, supra.* —— U.S. at ——, note 51, 103 S.Ct. at 912, note 51. These two most recent pronouncements by the Supreme Court encompass a divergent analysis from that articulated by this Circuit in *Malamud* and *Chrysler Corporation*. Accordingly, this Court acknowl-

---

**6.** The Court conceded that "it [is] virtually impossible to announce a black-letter rule that will dictate the result in every case". *Id.,* —— U.S. at ——, 103 S.Ct. at 908.

**7.** Footnote 33 provides in full:

Some courts have focused on the directness of the injury, *e.g., Loeb v. Eastman Kodak Co.,* 183 F. 704, 709 (CCA3 1910); *Productive Inventions, Inc. v. Trico Prods. Corp.,* 224 F.2d 678, 679 (CA2 1955), *cert. denied,* 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 394–395 (CA6 1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). Others have applied the requirement that the plaintiff must be in the "target area" of the antitrust conspiracy, that is, the area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. *E.g., Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 546–547 (CA5 1980); *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 17–18 (CA1 1979); *Calderone Enterprises Corp. v. United States Artists Theater Circuit, Inc.,* 454 F.2d 1292–1295 (CA2 1971). Another court of appeals has asked whether the injury is "arguably within the zone of interests protected by the antitrust laws." *Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1151–1152 (CA6 1975). See generally Berger & Bernstein, *supra* n. 31.

As a number of commentators have observed, these labels may lead to contradictory and inconsistent results. *See* Berger & Bernstein, *supra* n. 31, at 835, 843; Handler, The Shift From Substantive to Procedural Innovations in Antitrust Suits, 71 Colum.L. Rev. 1, 27–31 (1971); Sherman, Antitrust Standing: From *Loeb to Malamud,* 51 N.Y.U. L.Rev. 374, 407 (1976) ("it is simply not possible to fashion an across-the-board and easily applied standing rule which can serve as a tool of decision for every case"). In our view, courts should analyze each situation in light of the factors set forth in the text *infra.*

This directive to the federal forum appears to conclusively resolve the inquiry left open in *McCready* wherein the Court acknowledged that the various aids to analysis implemented by the circuit courts were "possibly conflicting" but refused to "evaluate the relative utility of any of these possibly conflicting approaches toward the problem of remote antitrust injury." *McCready, supra,* 457 U.S. at 476, 102 S.Ct. at 2547, note 12.

**8.** Phrased differently, the antitrust court is to ascertain "whether the law affords a remedy in specific circumstances" or "whether the [plaintiff] may recover for the injury it allegedly suffered". *Associated General Contractors, supra,* —— U.S. at —— and ——, 103 S.Ct. at 908 and 907.

edges the Supreme Court's concern that the various tests used by the Circuits, including this Circuit's zone of interests test, may result in inconsistent adjudications, and accordingly shall henceforth implement the Supreme Court's directive to consider the § 4 inquiry on a case by case basis by applying the criteria mandated by *Associated General Contractors.*[9]

In the action *sub judice* it is alleged that Malone intentionally monopolized the food market industry in the Southaven, Mississippi geographical area. As previously narrated, when Malone became aware that Southaven had a tenant which was prepared to immediately compete in the relevant grocery market in its leased premises at the Southaven commercial center, it refused to execute a written mutual cancellation agreement to surrender the premises to Southaven. Malone's conduct, it is charged by the complaint, was intended to perpetuate and promote its monopoly of the grocery market.

A significant element of the § 4 "standing" inquiry is the nature of the plaintiff's alleged injury either as a "customer" or "participant" in the "relevant market":

> In this case it is appropriate to focus on the nature of the plaintiff's alleged injury. As the legislative history shows, the Sherman Act was enacted to assure *customers* the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of *participants* in the *relevant market.*

*Associated General Contractors, supra,* —— U.S. —— – ——, 103 S.Ct. at 908–09 (emphasis added). In the case before this Court the "relevant market" has been identified in the complaint as the retail grocery industry in the geographical area of Southaven, Mississippi. The pleading probatively concedes that Southaven is neither a consumer, competitor or participant in that market. Rather, Southaven is a lessor of commercial premises whose grocery outlet lessees compete in the relevant product

market. However, a finding or concession that Southaven is not a direct participant in the relevant market is not dispositive of the § 4 "standing" issue. *McCready* instructs that an injury "inextricably intertwined" with the injury sought to be inflicted upon the relevant market or participants therein may fall "within the area of congressional concern" so as to satisfy the § 4 inquiry. In *McCready* it was alleged that Blue Shield and the Neuropsychiatric Society of Virginia, Inc., conspired to restrain competition in the market for psychotherapeutic services by providing insurance coverage only for consumers who patronize psychiatrists rather than psychologists. Through economic incentives, the conspirators were alleged to have channeled "consumers" of psychotherapeutic services, such as McCready and her class, to effect an economic boycott of competitors of psychiatrists in the relevant market. This manipulation of a class of consumers of psychotherapeutic services served to "inextricably intertwine[ ]" their injuries with those injuries sought by the conspirators to be inflicted upon participants in the psychotherapy market. In the case at bar Southaven's injury cannot be construed as "inextricably intertwined", within the meaning of *McCready,* with the injury allegedly inflicted by Malone upon the relevant grocery market so as to make Southaven's injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *McCready, supra,* 457 U.S. at 483, 102 S.Ct. at 2550, referencing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977). Southaven is not alleged to be a member of a class of "consumers" of grocery products or a class otherwise manipulated or utilized by Malone as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets. Although Southaven's injury may be a tangental by-product of Malone's averred monopolistic conduct, such injury is not *inextricably* intertwined to any injury inflicted

---

9. The case at bar does not require this Court to confront the issue of whether the factors enun-

ciated in *Associated General Contractors* are exhaustive or merely illustrative.

upon the relevant market. Accordingly, Southaven is not a consumer, customer, competitor or participant in the relevant market or otherwise inextricably intertwined with any such entity. Its injury is not sufficiently linked to the pro-competitive policy of the antitrust laws.[10]

The "existence of more direct victims" of the alleged antitrust violation is another related area of § 4 inquiry in evaluating "standing". *Associated General Contractors, supra,* —— U.S. at ——, 103 S.Ct. at 913. More direct victims may justify denial of a § 4 remedy to those only tangentally injured since such "is not likely to leave a significant antitrust violation undetected or unremedied." *Id.,* —— U.S. at ——, 103 S.Ct. at 911. That there exists, in the case at bar, more direct victims of Malone's alleged monopoly follows as an inescapable corollary to the foregoing observation that Southaven is neither a consumer or participant in the relevant market. These two categories of potential plaintiffs—consumers and participants—are obviously more direct victims. Indeed, Southaven's complaint acknowledges the existence of both classes of injured parties.[11]

Yet another relationship to be considered in the § 4 "standing" inquiry is "the directness or indirectness of the asserted injury." *Id.,* —— U.S. at ——, 103 S.Ct. at 910. Particularly, indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages. Confronting the issue of Southaven's damages, the complaint is notable for what it fails to allege. Southaven has not plead that Malone has breached or failed to perform any condition or covenant in its lease which it assumed on May 15, 1974. Particularly, Southaven has not alleged that Malone has failed to tender rental payments. Nor does the complaint state that Southaven would receive greater rental from its proposed lessee than it would receive from Southaven under the existing lease. In sum, it has not been plead that Malone's alleged breach of contract caused Southaven financial disadvantage. Nevertheless, the complaint prays for "actual damages of $500,000.00 or such damage as may be established at the trial and as provided in 15 U.S.C. § 15 including treble damages" and punitive damages in an equal amount. It appears that the only allegation in the pleading which serves to identify with any specificity economic injury to Southaven is the following:

> Malone ... has intentionally sought to destroy competition, monopolize and control the food market and food supply in interstate commerce and has undertaken to cut prices and otherwise *destroy the feasibility of a grocery store in Plaintiff's shopping center* and this area of interstate commerce. [Malone's] acts of unfair competition and monopolization have *subverted Plaintiff's business and financial interests* as well as the interests of the consuming public and other food suppliers and retailers. (Paragraph 6, emphasis added).

---

**10.** Specifically, Malone is alleged to have monopolized the grocery industry in violation of Section 2 of the Sherman Act. Monopoly power is the power to control prices or exclude competition. *U.S. v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). *Accord: Borden, Inc. v. Federal Trade Commission,* 674 F.2d 498, 507 (6th Cir. 1982); *Bataseed, Inc. v. U & I Inc.,* 681 F.2d 1203, 1231 (9th Cir.1982); *Dimmit Agri Industries, Inc. v. CPC International Inc.,* 679 F.2d 516, 525 (5th Cir.1982). Logic dictates, therefore, that the primary class of persons protected by § 2 are those adversely affected as a result of controlled prices or an exclusion of competition. In the case at bar Southaven has not adduced an injury resulting from either controlled prices of grocery products or exclu-

sion of competitors or participants in the grocery industry.

**11.** The complaint states at Paragraph 6:
> Defendant's acts of unfair competition and monopolization have subverted Plaintiff's business and financial interests as well as the interests of the consuming public and other food suppliers and retailers.

Similarly, Paragraph 8 provides:
> [Malone] desires to destroy the site as a present and future location for the retail sale of groceries and further desires to illegally dominate, control and monopolize the free competition in the area by damaging Plaintiff, the consuming public and other business in the trade area.

Liberally construed, this allegation may support the inference that Southaven has been injured, as a lessor of retail premises, in its ability to command premium rent from *all* lessees due to an economically unattractive shopping area resulting from lack of a grocery enterprise therein. However, to the extent that Southaven's injury is predicated upon a diminished consumer interest in and activity at its shopping area as a result of consumer preference for shopping centers with grocery retailers, and a corresponding inability to realize high rents from other lessees, ascertainment of damages to compensate such injury would necessitate wide ranging speculation, particularly since diminished consumer activity at any given shopping area could result from myriad independent reasons unrelated to the alleged antitrust violation.[12] *See: Associated General Contractors, supra,* —— U.S. at ——, 103 S.Ct. at 911 ("the [plaintiff's] damages claim is also highly speculative").

Last, it is observed that Southaven's injury is "remedial under other laws", namely, contract law. *Associated General Contractors, supra,* —— U.S. at ——, 103 S.Ct. at 911.

In the action *sub judice* Southaven has plead a causal connection between its injury and an antitrust violation; it has also adduced that Malone intended to cause that harm. However, these two factors were also satisfied in *Associated General Contractors* and adjudged insufficient, when compared with other factors, to satisfy the § 4 inquiry. A careful consideration and balancing of the most relevant criteria mandated in *Associated General Contractors* leads this Court to conclude that Southaven is not a proper plaintiff under § 4 of the Clayton Act. The judgment of the district court dismissing the cause of action is therefore AFFIRMED.

12. Further, should Southaven possess a § 4 remedy against Malone predicated upon diminished lease revenue resulting from less consumer activity at a shopping area without a grocery enterprise, then it follows axiomatically that Southaven's non-grocery lessees would possess a similar cause of action predicated upon diminished sales resulting from less consumer activity. Not only would the potential damage claims of these absent plaintiffs be highly speculative, but apportionment of damages among the lessees, and Southaven, would require complex calculations joining, at best, conceptual difficulties. *See: Associated General Contractors, supra,* —— U.S. at ——, 103 S.Ct. at 912 ("the District Court would face problems of identifying damages and apportioning them").