**BARNOSKY OILS, INC., Plaintiff,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant.**

Civ. A. No. 77–71163.

United States District Court,
E.D. Michigan, S.D.

March 22, 1984.

Irving I. Saul, Dayton, Ohio, Clint L. Pierson, Jr., Covington, La., for plaintiff.

Dickinson, Wright, Moon, Van Dusen & Freeman by John A. Krsul, Jr., Kenneth J. McIntyre, Philip M. Frost, Detroit, Mich., for defendant.

## OPINION

GILMORE, District Judge.

This is an antitrust action originally filed in 1977. On December 15, 1978, Judge Kennedy, this Court's predecessor, granted defendant's motion for summary judgment. The United States Court of Appeals for the Sixth Circuit affirmed Judge Kennedy on all counts except for exclusive dealing claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.[1] These claims were remanded for further consideration.

Defendant Union Oil Company of California (Union) is a major oil company engaged in the refining and marketing of petroleum products, and during times relevant to this complaint relied on two methods of distributing its products—distribution to retail outlets it served directly called "direct served" dealers, and distribution to independent wholesalers known as "jobbers." Plaintiff was a Union jobber who bought Union gasoline for sale to Union stations which plaintiff owned or had contracts with. The contract that Union had with plaintiff required plaintiff to resell gasoline purchased from Union under Union brands or trademarks only.

After remand, on April 1, 1982, plaintiff filed a second amended complaint asserting exclusive dealing violations of the Sherman Act and the Clayton Act (Count I) and parallel state law violations (Count II).

Discovery has been completed, and defendant has moved for summary judgment on the exclusive dealing claims. For the reasons stated in this opinion, defendant's motion for summary judgment will be granted.

In support of its exclusive dealing claims, plaintiff alleges that Union entered into tacit, exclusive dealing agreements with its "direct served" dealers in the metropolitan Detroit area, and that these exclusive dealing arrangements required the "direct served" dealers to purchase all of their gasoline requirements from Union Oil directly, thus preventing Barnosky from selling its Union Oil gasoline to these "direct served" dealers.

Union denies that it had exclusive dealing arrangements with its "direct served" dealers. Both parties agree the contracts involved do not expressly call for exclusive dealing. Plaintiff argues, however, that this was the actual practice and the Court of Appeals has held that this is an issue of fact to be resolved if a trial is held. 665 F.2d at 86. However, for the purpose of this motion, Union concedes the existence of exclusive dealing contracts with its "direct served" dealers.

■ Section 3 of the Clayton Act, 15 U.S.C. § 14,[2] prohibits the use of exclusive dealing or requirements contracts where the effect of such contract "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Although the plaintiff has also asserted an exclusive dealing claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, this Court is primarily concerned with an analysis under Section 3 of the Clayton

---

1. *Barnosky Oils, Inc. v. Union Oil Company of California*, 665 F.2d 74, (6th Cir.1981).

2. Section 3 of the Clayton Act provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Act, for, as the Court of Appeals noted in its opinion, if the arrangement is legal under the Clayton Act, it is also legal under the less stringent Sherman Act. 665 F.2d at 85, *citing Tampa Electric Company v. Nashville Coal Company*, 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580 (1961).

Judge Kennedy originally dismissed plaintiff's exclusive dealing claims under the authority of *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir.), *cert. denied* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). The Court of Appeals found *Ace Beer* not to be controlling, and remanded plaintiff's exclusive dealing claims, directing this Court to apply the three-step analysis established by the Supreme Court in *Tampa Electric, supra.* This Court has now before it a full record of completed discovery, and a full opportunity has been given plaintiff to develop facts to meet defendant's contention.

*Tampa Electric* established a three-part test for analyzing exclusive dealing claims under Section 3 of the Clayton Act.

> *First,* the line of commerce ... involved must be determined, where it is in controversy, on the basis of facts peculiar to the case. *Second,* the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably return for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected ... *Third,* and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited ...

365 U.S. at 327–28, 81 S.Ct. at 627–628.

According to the Supreme Court, several factors are relevant in determining whether the exclusive dealing contract at issue forecloses competition in a substantial share of the relevant market.

> It is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant area market, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

365 U.S. at 329, 81 S.Ct. at 629.

For the purpose of this motion, Union concedes the existence of exclusive dealing contracts between it and its "direct served" dealer. There is no dispute over the line of commerce involved or the market area. Both parties agree that this case involves the distribution of petroleum products (primarily gasoline) in the metropolitan Detroit area.

■ Union's concession of an exclusive dealing contract between it and its "direct served" dealers does not establish a Section 3 Clayton Act claim. Section 3 of the Clayton Act does not prohibit all exclusive dealing or requirement contracts, but rather only prohibits those where competition in a substantial share of the market is foreclosed. *Standard Oil Company of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

■ It is further clear that as a matter of law, Union's share of the metropolitan Detroit area market during the years in question cannot be considered to be "substantial." Union has presented statistics, unrebutted by the plaintiff, that indicate that Union's "direct served" stations [3] represented less than 1 per cent of the market area, on the average. Specifically, for the time period 1976 to 1980, Union's "direct served" dealers constituted 1.36 per cent,

---

**3.** The relevant area of competition from which plaintiff was allegedly foreclosed from making

sales.

1.07 per cent, .92 per cent, .84 per cent, and .62 per cent of the relevant market.

This market share is simply too small to be "substantial" under *Tampa Electric.* In *Tampa Electric,* the Supreme Court found a 1 per cent market share to be "conservatively speaking, quite insubstantial." *Id.* 365 U.S. at 333, 81 S.Ct. at 631. The *Tampa Electric* Court also cited *United States v. Columbia Steel,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), a Section 1 Sherman Act case where a 3 per cent share was held to be too small to damage competition. *See also T.A.M., Inc. v. Gulf Oil Corporation,* 553 F.Supp. 499 (E.D.Pa. 1982) (7 per cent share, where defendant was 6th out of 13 competitors, did not substantially lessen competition). Union's average rank, in comparison to 31 other competitors, was only 9th, thus distinguishing its situation both in terms of market share and competitive standing from *Standard Oil, supra.*

Under any analysis of the *Tampa Electric* factors, Union's market share is insubstantial. Percentages alone indicate this result. A further examination of the *Tampa Electric* test indicates other factors which also compel this result.

There is vigorous interbrand competition in this industry. Union had 31 other competitors in Michigan during the years in question, and 19 other competitors in Detroit. Plaintiff competed with 84 other jobbers in the relative market area. Considering the "probable effect of the contract on the relevant area of effective competition" these statistics, unrebutted by plaintiff, compel a finding that as a matter of law Union's exclusive dealing contracts, if they existed, could not have foreclosed a substantial area of competition that would be prohibited by Section 3 of the Clayton Act.

Furthermore, *Tampa Electric* indicates that a court is permitted to weigh "the probable immediate and future effects which preemption of that share of the market might have on effective competition therein." During the periods of events covered by the complaint here, Union brand jobbers increased their share of sales of Union products from 50.2 percent in 1971 to 67.0 percent in 1977. This statistic, again unrebutted by plaintiff, is inconsistent with any theory alleging that defendant's practices had an anticompetitive effect on jobbers. Plaintiff has raised no material issue of fact disputing these statistics, nor does it offer any analysis of Union's market share alone that would preclude the granting of summary judgment.

Plaintiff's basic contention is that it must be allowed to introduce evidence at trial that at least eight other major oil companies in the metropolitan Detroit area also employed exclusive dealing contracts during the period in question. By this means, plaintiff seeks to prove that, although Union's share, taken by itself, would not be enough to "substantially lessen competition," when taken in context of an industry-wide practice, the combined effect of all of these practices creates Section 3 Clayton Act liability against Union.

Union is the only defendant in this case. Plaintiff makes no allegations of horizontal conspiracy, collusion, or any kind of concerted action between Union and the other oil companies. Instead, plaintiff argues that Union's exclusive dealing contracts, when viewed in a context where everyone else is also doing it, meets the Section 3 requirement of foreclosing a substantial share of the market to competition.

The Court, however, finds the existence of other alleged exclusive dealing arrangements not relevant in this case. No case authority supports plaintiff's contention, although plaintiff points to some discussion which indicates that considerations of the existence of other exclusive dealing contracts may be relevant. In *Standard Oil Company of California v. United States,* the Supreme Court noted:

When it is remembered that all the other major suppliers have also been using requirements contracts, and when it is noted that the relative share of the business which fell to each has remained about the same during the period of their use, it would not be farfetched to infer that their effect has been to enable the established suppliers individually to maintain

their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market. (footnotes omitted) 337 U.S. at 309, 69 S.Ct. at 1059.

■ Later in *Tampa Electric, Standard Oil* was distinguished when the Court noted that there were not "myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts." 365 U.S. at 334, 81 S.Ct. at 631. Plaintiff's argument is interesting from an abstract point of view and, in the proper context, the existence of other exclusive dealing contracts might become relevant in proving a Section 3 Clayton Act violation. However, plaintiff has made no showing here that the existence of other exclusive dealing arrangements would be relevant. Under *Tampa Electric*, the Court is not permitted to engage in abstract speculation when dealing with a Section 3 claim. A careful analysis must be made of the particular claim and the context in which it is made.

■ There are several reasons why the introduction of evidence of the existence of exclusive dealing arrangements by other major oil companies in the metropolitan Detroit region is not relevant under a proper consideration of *Tampa Electric*. First, there is a practical objection. Union is the only defendant in this case. There are no allegations of any concerted action by Union with any of the other oil companies. Like Union, the other companies deny the existence of exclusive dealing arrangements.

To force Union, a defendant with a relatively minor market share, to defend not only its own practices but the practices of all of its major competitors would be an extremely heavy burden. Aside from the practical problems of conducting a defense, Union would have no incentive to defend the practices of its larger competitors, and there is no reason it should be forced to in order to escape antitrust liability.

Furthermore, an analysis of the economic relationships in the instant case compels the exclusion of such evidence. A careful examination of plaintiff's claims indicates that the sole injury plaintiff can complain of is injury to *intrabrand* competition. Barnosky was a jobber or wholesaler of Union brand oil. According to the allegations in plaintiff's complaint, Barnosky was required to sell the motor fuel purchased from Union "only under the proper brands, trade names and trademarks of Union."

Thus, Barnosky's only legally cognizable complaint under Section 3 of the Clayton Act is that Union, through exclusive dealing arrangements, prohibited its "direct served" dealers from buying their Union brand gasoline from Barnosky. The Court is concerned here only with Union brand gasoline, and the effect on competition, if any, is solely an effect upon *intrabrand* competition. Although plaintiff alleges exclusive dealing, in economic terms this practice is much closer to vertical restraints on distribution where the analysis involved focuses on attempts to control *intrabrand* competition. *See Continental T.V., Inc. v. GTE Sylvania, Inc.* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

In view of the fact that plaintiff's complaint involves restrictions on *intrabrand* competition only, the practices of Union's competitors become irrelevant. Whether or not these practices existed does not matter for they had no effect on Barnosky's ability to sell Union brand oil. Plaintiff has failed to show any causal connection between the alleged exclusive dealing violations of the other eight oil companies and any injury to plaintiff, because the sole effect on competition relative to this case is an alleged restriction on *intrabrand* competition. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

Barnosky's situation is different from the service station dealer in *Standard Oil.* There the existence of similar contracts in the industry was arguably relevant. The dealer had a contract with Standard that precluded him from purchasing oil from the competitors of Standard. Likewise, the exclusive dealing contract in *Tampa Electric*

precluded the electric company from purchasing coal from other competitors of Nashville Coal. These cases clearly involve interbrand competition where the existence of other similar contracts could shed light on interbrand competition. Barnosky's position as a wholesale distributor of Union products in competition with its own supplier only makes this kind of examination irrelevant. *See Bowen v. New York News, Inc.,* 366 F.Supp. 651 (S.D.N.Y.1973), *aff'd* 522 F.2d 1242 (2d Cir.1975), *cert. denied* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976).

Finally, plaintiff argues that summary judgment is inappropriate here because the Court of Appeals, in its previous opinion, rejected defendant's present contentions. It should be noted, however, that the court did not conduct an analysis of this case under *Tampa Electric,* and, although the defendant made a similar argument on appeal regarding its market share, the case was before the court without the benefit of full discovery and without a full opportunity for plaintiff to present material issues of fact.

Plaintiff has now had that opportunity, and there is nothing to support its contention that the Court of Appeals considered the issue of the admissibility of the evidence of other oil companies' practices. There are no issues of motive or intent here that would preclude summary judgment. *Cf. Poller v. Columbia Broadcasting System Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Although courts should be reluctant to grant motions for summary judgment for antitrust defendants when there is a possible factual basis for a plaintiff's claim, the plaintiffs cannot simply rest upon their pleadings. *Smith v. Northern Michigan Hospitals,* 703 F.2d 942, 947 (6th Cir.1983). Plaintiff has introduced no facts rebutting defendant's contentions regarding its share of the market, nor has plaintiff introduced any evidence that could demonstrate the relevance of the practices of defendant's competitors, or a causal connection between these practices and plaintiff's injury. Therefore, defendant's motion for summary judgment will be granted.

Count II of plaintiff's complaint alleges violations of various Michigan statutes, and these allegations are either completely parallel to plaintiff's federal claims or inapplicable to the facts of this case, and, accordingly, that count will also be dismissed.