**David L. FALLIS, Plaintiff–Appellant,**

v.

**PENDLETON WOOLEN MILLS, INC., Defendant–Appellee.**

No. 87–3818.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1988.

Decided Jan. 25, 1989.

**210**

Arthur M. Wisehart (argued), Wisehart & Koch, New York City, for plaintiff-appellant.

Thomas S. Calder (argued), Dinsmore & Shohl, Cincinnati, Ohio, for defendant-appellee.

Before KEITH, KENNEDY and MILBURN, Circuit Judges.

KENNEDY, Circuit Judge.

Appellant David L. Fallis was a regional sales representative for Pendleton Woolen Mills, Inc. (Pendleton). Fallis alleges that Pendleton harassed him and ultimately terminated his contract because he refused to participate in a vertical price fixing scheme. According to appellant, Pendleton required him to boycott or punish "discounters" which sold for less than Pendleton's "keystone" prices. He alleges that when he resisted the scheme, Pendleton retaliated by reducing his sales territory and, eventually, firing him. Fallis brought a federal antitrust action and state tort and contract actions against Pendleton.[1] The District Court granted summary judgment for Pendleton on the antitrust claim, holding that Fallis lacked antitrust standing. The District Court also granted summary judg-

ment for Pendleton in the tort action. The court applied Ohio law and concluded that no "public policy" tort for wrongful discharge exists in Ohio. The contract claim was tried to a jury, which found for Pendleton. Fallis appeals from each of these judgments. We affirm.

## I. ANTITRUST STANDING

This Court has set forth a comprehensive framework for analyzing antitrust standing issues in *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047 (6th Cir.1986) and *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983).[2] These cases elaborated a five-part test, which considers:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and whether that harm was intended to be caused;

(2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;

(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

(4) the potential for duplicative recovery or complex apportionment of damages; and

(5) the existence of more direct victims of the alleged antitrust violation.

*Province*, 787 F.2d at 1050–51. Standing turns on a balancing of these factors; "[n]o single factor is dispositive." *Id.* at 1051. We will now consider each of these factors in light of the record in this case.

*Causal Connection and Intent to Cause Harm.*

In the present case, the causal nexus is attenuated. Appellant alleges that Pendleton's plan to eliminate discount sales injured him by reducing his commissions. This injury is derivative; it is simply a side effect of Pendleton's alleged antitrust vio-

**1.** Federal jurisdiction over the tort and contract claims is premised on diversity of citizenship. Fallis is domiciled in Ohio, and Pendleton is an Oregon corporation.

**2.** The framework developed in *Province* and *Southaven* follows the Supreme Court's analysis in *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

lations. Nor has appellant made any showing that Pendleton's alleged keystone pricing plan was intended to harm him. The scheme apparently was aimed at disciplining retailers and raising consumer prices, not reducing the commissions earned by salespersons. Any injury to appellant was merely incidental to the purposes of the alleged price-fixing arrangement.

### Status as a Consumer or Competitor in the Market.

Fallis was neither a competitor nor a consumer in the relevant market. However, he does claim that he was "manipulated by [Pendleton] to cause antitrust violations" and "terminated for refusing to participate in the illegal scheme." *Province* held that "a finding that plaintiffs were not direct participants in the relevant market does not automatically preclude standing." 787 F.2d at 1052. A plaintiff can also satisfy the "status in the market" prong if his injury is "inextricably intertwined" with the antitrust violation. *Id.* An inextricably intertwined injury exists where the plaintiff has been "manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors...." *Id.* (quoting *Southaven*, 715 F.2d at 1086). Appellant alleges that Pendleton used him as a fulcrum in its efforts to punish discounters. For purposes of this appeal, we assume that Fallis was used as a fulcrum by Pendleton. But it does not necessarily follow, as appellant's brief assumes, that he therefore has antitrust standing. As *Province* makes clear, a finding that the plaintiff was used as a fulcrum to inflict antitrust injury simply means that he is "not automatically preclude[d]" from bringing an antitrust action by the "status in the market" prong of the standing test. The

standing inquiry turns on a balance of several factors, not simply the plaintiff's status in the market or role as an economic fulcrum.

### Directness of the Injury and Existence of More Direct Victims.

In *Province* former employees of the Cleveland Press (Press) brought an antitrust action premised on the allegation they had lost their jobs because of an illegal conspiracy between the Press and a competitor, the Cleveland Plain Dealer. This court found that the employees lacked antitrust standing, emphasizing the indirectness of the employees' injuries and the existence of more direct victims. Like the press workers' injury in *Province*, Fallis' injuries are a "byproduct" of the alleged antitrust violation. The "wrongful result" Pendleton allegedly sought was vertical price maintenance, "not the termination of the plaintiff['s] employment," 787 F.2d at 1053, or the diminution of his commissions. As is generally true where the plaintiff's injury is indirect, more direct victims of the alleged conspiracy exist in the present case: discounters and consumers. It is true that consumers may have little incentive to sue over an increase in the cost of one line of clothing,[3] but the interest of the discounters is direct and substantial. Here, appellant's injury was indirect, and more direct victims exist. Both of these facts militate against finding standing. *Province*, 787 F.2d at 1053.[4]

### Potential for Duplicative Recovery or Complex Apportionment of Damages.

This factor also weighs heavily against appellant. Appellant's alleged antitrust injury is indirect and derivative, and "if the court were to allow all indirect victims

---

**3.** Moreover, consumer standing might be precluded by *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

**4.** The district court for the Southern District of New York found standing under very similar facts in spite of the indirectness of the injury. See *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423 (S.D.N.Y.1986). We decline to follow *Donahue's* guidance. As a leading commentator has observed:

> [N]o useful policy is served by granting standing to a terminated employee for a product

market violation that is known to others. Thus the court in *Donahue* was wrong in granting standing to commission salesmen who were allegedly terminated because they objected to their employer's resale price maintenance scheme. In such a case the impact of the violation falls upon the dealers upon whom resale price maintenance is imposed, and they will know of the violation and have an incentive to sue.

Areeda & Hovenkamp, *Antitrust Law* ¶ 338d (Supp.1986).

standing to sue and potentially be awarded treble damages, the dangers of duplicative recovery and complex apportionment of damages would become very real." *Id.* *See also Southaven*, 715 F.2d at 1087 ("Particularly, indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages.").

In light of the factors discussed above, we concur with the District Court's well-reasoned conclusion that appellant lacks antitrust standing. Only his alleged role as a "fulcrum" for Pendleton's pressure on discounters weighs in favor of standing. This is outweighed by the indirectness of appellant's injury, the existence of more direct victims, and the resultant danger of double recovery or complex apportionment of damages.

## II.   CONTRACT CLAIMS

■ Appellant argues the District Court should have evaluated his contract claims under Oregon, rather than Ohio, law. Ordinarily, a court "must apply the choice-of-law rules of the state in which it sits." However, where a case is transferred under 28 U.S.C. § 1404(a), the transferee court must apply the choice of law rules of the transferor state. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n. 8, 102 S.Ct. 252, 259 n. 8, 70 L.Ed.2d 419 (1981). This case was transferred to Ohio from New York pursuant to section 1404(a). Accordingly, New York choice-of-law rules apply, and it is our task to determine whether a New York court would apply Ohio or Oregon law to Fallis' state law claims.

■ New York employs "interest analysis" to resolve choice-of-law questions: "[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985) (quoting *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968)) (brackets in original). In contract cases, New York conflicts law focuses on the place of negotiation, the place of contracting, and the place of performance. *See Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). In *Daystrom*, for example, the Court of Appeals held that New York's statute of frauds applied to a contract between a New Jersey corporation and a New York corporation, although the alleged oral modification of the contract occurred in New Jersey. The court concluded New York had "sufficient contacts" to have a "substantial interest" in applying its own law, since the agreement arose out of a meeting in New York and an advertisement in a New York newspaper, and the services "were substantially performed in New York." 300 N.Y.S.2d at 827, 248 N.E.2d 576. *See also Silverman v. Worsham Bros.*, 625 F.Supp. 820, 826 (S.D.N.Y.1986) (under New York conflicts rules, Florida law applied, where contract was executed and to be performed in Florida, and three of the plaintiffs were Florida corporations).

Although there is some dispute as to where the contract was "finalized," Ohio clearly had the most significant contacts with the contractual relationship. Fallis' first interview with Pendleton took place in Ohio. After additional interviews in Oregon, Fallis again met with a Pendleton official in Ohio, and the two "shook hands" on an offer of employment; Fallis never had a written contract with Pendleton. Following the "handshake agreement," Fallis travelled to Oregon for psychological tests, orientation, and briefings. While in Oregon, he also signed an acknowledgement of the applicability of a prior FTC consent order. Fallis resided in Ohio and operated his Pendleton distributorship out of an Ohio office. The contract was performed in Ohio and the surrounding states. Since the contract was negotiated and agreed to in Ohio, and largely performed in Ohio, we conclude the District Court correctly applied Ohio law to the contract.

Fallis also objects to the District Court's interrogatory asking the jury whether

there was a contract for a "fixed term" between the parties, arguing the jury should have been asked whether the contract was "for the balance of his career until retirement." This argument is meritless. The instruction Fallis now requests would have required a directed verdict for Pendleton; for under Ohio law a contract for employment "until retirement" is construed as an indefinite hiring, terminable at will. *See Meredith v. Rockwell International Corp.*, 826 F.2d 463, 468 (6th Cir. 1987) (citing *Frankhart v. Jeep Corp.*, No. L–85–062 (Ohio App. Nov. 8, 1985)) [1985 WL 8222].

■ Equally meritless is Fallis' argument that his promissory estoppel claim should have been presented to the jury. Fallis contended that he changed his residence and employment in reliance on Pendleton's offer of employment until retirement. The trial court properly directed a verdict for Pendleton on this issue. Because employment until retirement constitutes an at-will relationship in Ohio, "reliance on a purported promise of 'permanent' employment 'must be construed as unreasonable and therefore insufficient to meet the requirements of a cause of action in promissory estoppel.'" *Meredith*, 826 F.2d at 469 (quoting *Frankhart*, slip. op. at 4).

Appellant also challenges the District Court's "massive" exclusion of evidence. After a careful review of the record, we conclude the trial judge did not abuse his discretion. The excluded evidence was only marginally relevant to the central issue before the jury: the nature of Fallis' agreement with Pendleton.

### III. TORT CLAIMS

Appellant contends the District Court erred in not applying Oregon law to his tort claims. Appellant's tort count essentially sets forth a claim of wrongful discharge in violation of public policy. The viability of this claim turns on the choice of law, because Oregon permits a terminated at-will employee to bring a "public policy" tort action against his erstwhile employer, while Ohio generally does not. *Compare*

*Delaney v. Taco Time Int'l., Inc.*, 297 Or. 10, 681 P.2d 114 (1984), *with Phung v. Waste Management, Inc.*, 23 Ohio St. 3d 100, 491 N.E.2d 1114 (1986).

We conclude the District Court correctly applied Ohio law to appellant's tort claims. The subject matter of the tort claim is coextensive with the contract claim. As discussed above, Ohio has the most significant contacts with and the greatest interest in the economic relationship between Pendleton and Fallis. The agreement between the parties was negotiated in Ohio and performed in Ohio and the neighboring states. Fallis operated out of an Ohio office and resided in Ohio. Finally, the impact of the allegedly tortious injury was felt in Ohio. Therefore, Ohio had "the greatest concern with the specific issue raised in the litigation," and the District Court properly applied its law. *Schultz*, 491 N.Y.S.2d at 94, 480 N.E.2d 679.

### IV. CONCLUSION

The judgment of the District Court is AFFIRMED.