**BODIE–RICKETT AND ASSOCIATES; William R. Bodie; and Glenn D. Rickett, Plaintiffs–Appellants,**

v.

**MARS, INCORPORATED, a Delaware Corporation; Forrest E. Mars, Jr.; Ron Allen; Bernie Lee; and John Mars, Defendants–Appellees.**

No. 91–5738.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1992.

Decided Feb. 28, 1992.

Rehearing and Rehearing En Banc Denied April 7, 1992.

Kathleen L. Caldwell (briefed), Paul M. Ledbetter (argued & briefed), Taylor, Halliburton, Ledbetter & Caldwell, Memphis, Tenn., for plaintiffs-appellants.

Lisa A. Krupicka, J. Brooke Lathram (argued & briefed), Burch, Porter & Johnson, Memphis, Tenn., for defendants-appellees.

Before KENNEDY and GUY, Circuit Judges, and ENGEL, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Bodie–Rickett and Associates, a broker of snacks and candies in Tennessee, appeals the district court's ruling that it lacks standing to sue defendant, snack and candy manufacturer Mars, Inc., for allegedly violating federal antitrust laws. 15 U.S.C. §§ 1, 2, and 14. Plaintiff broker also appeals the dismissal of its state-law fraud and misrepresentation claims, over which the district court believed it lacked jurisdiction once it had disposed of plaintiff's federal claims.

Finding that the injury to plaintiff was merely incidental to changes in Mars' brokerage strategy, and that there were more direct victims of Mars' allegedly anticompetitive conduct, we affirm the judgment with respect to the antitrust claims. Since the district court erroneously treated the state-law claims as pendent, rather than as independently proper under diversity jurisdiction, we reverse the dismissal of these tort claims and remand for further consideration on the merits.

I.

Bodie–Rickett and Associates is a partnership operating in Tennessee as a broker of confectionery and savory (salty) snacks, receiving remuneration on a commission basis.[1] Defendant Mars is a manufacturer of such products; wholly-owned subsidiaries of Mars also produce Kal Kan pet food and Uncle Ben's rice. From 1983 until 1986, Bodie–Rickett served as Mars' statewide broker for all of its non-chocolate candy and savory snacks. Their contract, as is the custom in the industry, could be

---

1. We treat the partnership as the true plaintiff here. Any injury suffered by the two individual owners, William Bodie and Glen Rickett, would be derivative and thus insufficient to confer antitrust standing. *Peck v. General Motors Corp.*, 894 F.2d 844, 847 (6th Cir.1990); *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir.1987).

terminated by either party, without cause, on 30 days' notice. Mars sold its Kal Kan and Uncle Ben's products through other brokers located in Tennessee's western, middle, and eastern regions.

In December 1986, Mars decided to reorganize its brokerage arrangements in Tennessee and throughout the country. It is this restructuring which forms the basis of plaintiff's federal and state claims. According to Mars, consolidating all of its product lines with a single broker (in each of the three Tennessee regions) was intended to achieve certain efficiencies and generate greater loyalty to Mars on the part of the broker. Bodie–Rickett charges that Mars designed this reorganization in order to disrupt its rival manufacturers' broker networks and achieve greater power in the pet food and rice markets, enabling it to charge supracompetitive prices.

As part of the consolidation plan, Mars interviewed its current brokers to select the ones to which it would assign its product lines. Bodie–Rickett was one of the brokers interviewed. It calls this interview a sham, however, claiming that Mars had already decided to contract with another broker, that Mars misled Bodie–Rickett as to the purpose of the broker interviews, and that Mars refused to supply the figures on sales of pet food and rice which Bodie–Rickett needed in order to make an effective presentation at its interview.

Bodie–Rickett was not selected as a consolidated broker for Mars. Instead, its contract with Mars was terminated and the savory snack and confectionery lines it had brokered for Mars throughout the state were given to Sales Mark in the Memphis area, to Coke & McDaniel in the Nashville area, and to Lloyd & Sheffer in the Knoxville area. These brokers were also given (or they retained) the Kal Kan and Uncle Ben's products.

In exchange for being given all three Mars lines, these brokers agreed, according to Bodie–Rickett, to relinquish their brokerage relationship with the manufacturers of Starkist pet food and Comet rice, the products which competed with Kal Kan and Uncle Ben's. Under plaintiff's theory, Mars enticed these brokers into such an agreement by offering them the snack and candy lines taken away from Bodie–Rickett. Plaintiff proffers this "lure" theory to explain why it was not selected to represent all three Mars lines even though it was the only contender meeting all of Mars' criteria for consolidated brokers.

Mars does not appear to contest the charge that its consolidated brokers dropped the competing manufacturers' product lines. It does, however, dispute the claim that Bodie–Rickett was best suited to Mars' needs, since Bodie–Rickett lacked experience brokering food items (as opposed to snacks and candies).

Bodie–Rickett alleges that Mars' 1986 broker changes violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. Requiring the brokers to agree to drop competitors' lines and represent all three Mars lines ("tied" together) was, according to Bodie–Rickett, designed to so disrupt the distribution of those competing products that Mars would gain an unlawful competitive advantage and lessen competition in violation of 15 U.S.C. §§ 1 and 14. This conduct also allegedly constituted an attempt to monopolize under 15 U.S.C. § 2. Bodie–Rickett sought treble damages under 15 U.S.C. § 15. Bodie–Rickett also brought state-law claims of fraud and misrepresentation.

Mars won summary judgment with respect to the federal claims when the district court concluded that plaintiff lacked antitrust standing. Based on its disposition of the federal claims, the court then dismissed the state claims.

## II.

We review a district court's grant of summary judgment under a *de novo* standard. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). This principle aside, *de novo* review would be proper here because the question whether a plaintiff has standing to sue under the Sherman and Clayton Acts is one of law. *Midwest Communications, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 449 (8th Cir.1985), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

On its face, section 4 of the Clayton Act affords treble-damages relief to "any person ... injured in his business or property by reason of anything forbidden in the anitrust laws[.]" 15 U.S.C. § 15(a). Although this language appears broad, the Supreme Court has limited the class of persons who may sue by prescribing factors for a court to consider in determining a plaintiff's antitrust standing. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

This circuit first articulated the *Associated General Contractors* factors in *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983). Those factors on which the standing issue turns are:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* at 1085. These factors are to be balanced; no single factor is conclusive. *Peck v. General Motors Corp.,* 894 F.2d 844, 846 (6th Cir.1990).

According to plaintiff's theory of the case, the intended victims of Mars' antitrust scheme were Mars' competitors in the pet food and rice markets, and Mars' wholesale consumers who would have to pay higher prices for pet food and rice. The harm to Bodie–Rickett was the loss of its brokerage contract for Mars' candy and snack lines and its failure to win a contract as one of Mars' consolidated brokers.

We find that the causal nexus between the antitrust violation and plaintiff's injury is attenuated, just as it was in the similar case of *Fallis v. Pendleton Woolen Mills, Inc.,* 866 F.2d 209 (6th Cir.1989). In *Fallis,* a sales representative was fired when he refused to participate in a vertical price-fixing scheme. The defendant-manufacturer, Fallis's employer, had instructed him to boycott or otherwise punish discounters who sold below the manufacturer's "keystone" prices. Fallis claimed, under the first *Southaven* factor, that the manufacturer's plan to eliminate discount sales injured him by reducing his commissions. We concluded, however, that Fallis's injury was "simply a side effect" of the alleged antitrust violation, since the manufacturer's scheme, aimed at retailers in order to raise consumer prices, was not intended to reduce salespersons' commissions. *Fallis,* 866 F.2d at 210. "Any injury to [Fallis] was merely incidental to the purposes of the alleged price-fixing arrangement." *Id.* at 211.

The same was true of the injury to the employees in *Province v. Cleveland Press Publishing Co.,* 787 F.2d 1047 (6th Cir. 1986). There, former employees of the Cleveland Press claimed that they had lost their jobs when their employer closed as a result of an alleged conspiracy to eliminate competition between Cleveland Press and its rival, which became the sole surviving daily paper. *Id.* at 1048. These employees, we said, could not "show that their loss of employment resulted from the wrong which allegedly occurred: namely, the alleged monopolization of the daily newspaper market in Cleveland." *Id.* at 1052.

Bodie–Rickett's loss of commissions is similarly incidental to the alleged wrong here: Mars' devious scheme of gaining an unlawful advantage and raising prices by disrupting competitors' brokerage arrangements and requiring the selected brokers to represent all three Mars lines. This analysis of the first *Southaven* factor necessarily suggests the conclusion we reach regarding the fifth factor: the existence of more direct victims of the alleged antitrust violation. Again, according to plaintiff's view of the events, the intended targets of Mars' alleged conspiracy were competing manufacturers and wholesale customers. These are the direct victims; Bodie–Rickett

is merely an indirect victim and, as such, is not the ideal private party "to vindicate the public interest in antitrust enforcement[.]" *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 910.

■ *Southaven* also requires us to examine plaintiff's status in the "relevant market." This second prong of the test has generated a dispute between the parties as to the identity of the relevant market. Mars claims the market at issue is at the product level, specifically, the wholesale distribution of candy, snacks, pet food, and rice. Bodie–Rickett asserts the "market for brokerage services" as the relevant market. Under Mars' view, plaintiff would not qualify as a "consumer" or "competitor" in the relevant market, since it acts merely as an agent of manufacturers whose products compete at the wholesale level. If the "broker market" is the proper focus of our inquiry, then Bodie–Rickett would clearly qualify as a competitor.

We agree with Mars that the relevant market is not the "broker market," but rather the sale of Mars' and competitors' products at the wholesale level. That this is the market to examine is suggested by *Province*, in which the relevant market was the daily newspaper market in the Cleveland area—the market in which the restraint of trade was supposedly carried out. In *Southaven*, the relevant market was not leased premises but the area's retail grocery industry. *Southaven*, 715 F.2d at 1086–87 (finding a lessor of commercial property had no standing to sue its lessee, which had allowed the rented space to lie vacant rather than allow a competing grocer to operate there). Here, the alleged trade restraint or lessening of competition was to occur at the wholesale price level and not among the brokers of the competitors' products.[2]

■ Bodie–Rickett relies heavily on the alternative means of satisfying this second prong of the standing test. In *Province*, 787 F.2d at 1052, we noted that a finding that a plaintiff is not a direct participant in the relevant market does not automatically preclude standing. "[A] plaintiff can also satisfy this aspect of the inquiry by showing that plaintiff's injury is 'inextricably intertwined' with the injury sought to be inflicted on the relevant market." *Id.* at 1052 (citation omitted). A plaintiff is "inextricably intertwined" when it is "manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." *Southaven*, 715 F.2d at 1086.[3]

Bodie–Rickett likens itself to the plaintiff in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), who was accorded standing as a member of a class of consumers manipulated by defendants. McCready claimed that defendants, Blue Shield and a group of psychiatrists, conspired to injure psychologists—the group's competitors in the psychotherapeutic services market—by encouraging patients like McCready to boycott psychologists, for whose services the patients would receive no insurance reimbursement. This anticompetitive scheme could not have proceeded without the patients' active participation; their refusal to patronize the psychologists "was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479, 102 S.Ct. at 2548. Their injury—the lack of insurance reimbursement for psychologists' services—was thus "inextricably in-

**2.** Bodie–Rickett's claim that Mars intended to disrupt its competitors' brokerage arrangements is essentially a complaint about exclusive dealing (Mars' consolidated brokers supposedly having agreed to sell their services exclusively to Mars). Considering for a moment the merits of this charge, we note that such contracts are prohibited only when they foreclose a "substantial share" of the market. *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 582 F.Supp. 1332, 1334 (E.D.Mich.1984). It is undisputed in this case that no such portion of the brokerage market

was foreclosed to Mars' competitors. Starkist and Comet found replacement brokers immediately, and Mars' broker changes "set free" other brokers (including Saunders & Associates and Miller Brokerage) which it had been using.

**3.** As the district court correctly observed, plaintiff attempts to use this "fulcrum" or "manipulation" characterization to meet the other prongs of the standing test, when it is pertinent only to the "relevant market" prong.

tertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. at 2551. The same was true of the plaintiff in *Fallis;* his cooperation in boycotting the discounters was essential to the manufacturer's illegal scheme.

We cannot say that Bodie–Rickett was so manipulated by Mars. Even if the other brokers would not have agreed to stop representing Mars' competitors without the "lure" of Mars' candy and snack lines (which Bodie–Rickett had represented),[4] Mars' anticompetitive scheme required no active participation by Bodie–Rickett. Bodie–Rickett was merely the recipient of the bad news that Mars was terminating its terminable-at-will brokerage contract. If any entities here served as the "fulcrum" of Mars' scheme, they were Sales Mark and Coke & McDaniel. Nor would it help plaintiff much if we did decide the "manipulation" question in its favor. As we said in *Fallis,* 866 F.2d at 211, "[t]he standing inquiry turns on a balance of several factors, not simply the plaintiff's status in the market or role as an economic fulcrum."

 The remaining standing factors may be dealt with quickly, as they are closely related to each other and to the ones already discussed. Since we have already decided that plaintiff was not the intended target of the alleged scheme and that there were more direct victims (Starkist and Comet, and wholesale customers), and that Mars did not need to manipulate plaintiff to further that scheme, we also conclude that the scheme caused plaintiff only indirect injury. We have noted before that "indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages." *Southaven,* 715 F.2d at 1087. Since Bodie–Rickett seeks only to step into the shoes of Sales Mark and Coke & McDaniel, Mars' alleged co-conspirators, it makes no at-

tempt to distinguish the damages it sustained from those purportedly suffered by Mars' competitors and wholesale customers.

Bodie–Rickett's damages are speculative in other ways. Its damage calculation is based on the assumption that Mars would have selected it as the *statewide* broker for all three product lines. This assumption is dubious because Mars selected no other Tennessee brokers to represent its products statewide. In addition, plaintiff's future-commissions calculations assume that Bodie–Rickett would have retained that lucrative status indefinitely, when all the broker contracts contained bilateral termination-at-will clauses. It is also interesting to note that those calculations incorporate the expected inflated sales gains of Kal Kan and Uncle Ben's, which gains would not have occurred without the alleged scheme. Bodie–Rickett thus seeks to reap the rewards of the conduct it here condemns.

### III.

Bodie–Rickett also appeals from the district court's dismissal of its state-law fraud and misrepresentation claims, which the court treated as pendent claims. Bodie–Rickett had labelled these tort claims as "pendent" in its second substituted complaint, but it now contends—and Mars agrees—that these claims were independently proper under the court's diversity jurisdiction. We agree with the parties that the dismissal of these claims was in error.

For these reasons, we REVERSE in part and REMAND in part for further proceedings.

---

**4.** *Contradictory evidence was submitted on whether the other brokers would have accepted Mars' terms if Mars had not enticed them into the exclusive brokerage arrangements by including its candy and snack lines in the package. It*

*appears that the district court attempted to resolve this dispute in its summary judgment disposition, and did so in favor of Mars. The resolution of this disputed matter is not necessary for our decision.*